## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

## CASE NO.

------------------------------------------------- x

HOWMEDICA OSTEONICS CORP., a
subsidiary of STRYKER
CORPORATION, a New Jersey
corporation,

               Plaintiff,

   - against -

ALPHATEC SPINE, INC., a Delaware
corporation,

              Defendant.

------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

## COMPLAINT FOR DAMAGES AND PERMANENT INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Howmedica Osteonics Corp. ("Howmedica"), a subsidiary of

Stryker Corporation, acting through its Spine division (hereinafter collectively

"Stryker Spine"), by and through its undersigned counsel, brings this action against

Alphatec Spine, Inc. ("Alphatec"), and in support thereof states:

## NATURE OF THE ACTION

1.     Stryker Spine brings this action against Alphatec for: (i) tortious

interference with Stryker Spine's contracts; (ii) tortious interference with Stryker

Spine's business relations; (iii) violation of the Defend Trade Secrets Act of 2016

("DTSA"), 18 U.S.C. § 1836 *et seq*.; and (iv) violation of the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001 *et seq.*

2.     This dispute arises out of Alphatec's tortious interference with contracts Stryker Spine entered into with former distributors KG Surgical & Associates ("KG"), Haylett Inc. ("Haylett") and D.E.D. of South Florida, Inc. ("D.E.D.") (collectively "Distributors"), as well as their respective principal agents and sales representatives.

3.     Specifically, Alphatec has knowingly taken actions that have induced and will continue to induce each Distributor and its respective agents to violate the distributorship agreements Stryker Spine entered into with each Distributor as well as the post-contractual non-competition obligations each principal agent and sales representative agreed to and which prohibits him or her from competing with Stryker Spine for at least one year after the termination of their engagement.

4.     Alphatec's efforts are part of a wide-ranging, malicious and systematic plan which has resulted in significant reductions in Stryker Spine's sales force in Florida and other areas of the country, and misappropriation of Stryker Spine's trade secrets and valuable customer information, causing damage to Stryker Spine's relationships and reputation.

5.     Indeed, Pat Miles, Alphatec's CEO has publicly stated that it is his intent to rely upon the "Stryker prowess from a sales force know-how standpoint" in order to build Alphatec's client base and salesforce.

6.     Due to the unlawful behavior of Alphatec, Stryker Spine has undoubtedly lost (and will continue to lose) revenue and profits derived from spine product sales in the Florida region and beyond.

7.     Upon information and belief, the actions Alphatec is taking in the Florida region are representative of a nation-wide scheme to misappropriate Stryker Spine's trade secrets and tortiously interfere with its customer relationships by inducing Stryker Spine personnel to leave Stryker and share the company's trade secrets, giving Alphatec an unfair competitive advantage.

8.     Indeed, Alphatec leadership has touted that 9 of its 11 senior sales leaders, who are responsible for recruiting sales representatives across the country, came to Alphatec from Stryker Spine and are the baseline ingredient of Alphatec's "Disciplined Approach to Service."

9.     Alphatec's solicitation of Stryker Spine's sales force in Florida and other parts of the country poses harm that goes far beyond monetary losses. Stryker Spine's former sales representatives have maliciously been exploiting Stryker Spine's confidential and proprietary information to compete unfairly against Stryker Spine on behalf of Alphatec.  Armed with this information,

3

Alphatec has had an unfair advantage in targeting Stryker Spine's customers and employees, and has acquired a valuable roadmap for designing and improving its own products, customer relationships and goodwill.  Essentially, Alphatec seeks to misappropriate decades of Stryker Spine's client development and customer service techniques in order to unfairly shortcut its own success at Stryker Spine's expense.

10.     Stryker has warned Alphatec multiple times about this unlawful conduct, but Alphatec has nevertheless ramped up its recruitment efforts.

## **PARTIES**

11.     Howmedica is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Mahwah, New Jersey, but which regularly conducts business in Jacksonville and Jupiter, Florida.

12.     Alphatec is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Carlsbad, California, but which regularly conducts business in Jacksonville and Jupiter, Florida.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this action under 28 U.S.C. §

1332 because the parties are citizens of different states, and the matter in

controversy exceeds $75,000.00 excluding interest and costs.

14.     This Court has personal jurisdiction over Alphatec pursuant to Federal

Rule of Civil Procedure 4(k)(1)(A) and § 48.193, Fla. Stat., in that Alphatec has

engaged in substantial and not isolated activity in the State of Florida; Alphatec

operates, conducts, engages in, or carries on a business in the State of Florida; and

Alphatec has committed and continues to commit tortious acts in the State of

Florida which gave rise to the causes of action asserted herein.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because

Alphatec regularly does business in the Jacksonville, Florida area and a significant

portion of the tortious acts which give rise to the claims in this litigation occurred

in this District.

16.     This Court also has federal question jurisdiction pursuant to 28 U.S.C.

§ 1331, because Stryker Spine alleges claims against Alphatec under the DTSA, 18

U.S.C. § 1836 *et seq*.   Supplemental jurisdiction exists over the remaining claims

in this action pursuant to 28 U.S.C. § 1367 (a) because they are related to and arise

from the same set of operative facts as the DTSA claim.

## GENERAL ALLEGATIONS

### A.  Stryker Spine's Business

17.    Howmedica, through its Spine division, is a global leader in the development, manufacture and sale of spinal implants, instruments, and related products and services.

18.    Stryker Spine invents, designs, manufactures and sells a full range of spinal-related implants and products which make surgeries and recoveries simpler, faster and more effective.

19.    Stryker Spine products have broad appeal and acceptance in the marketplace and among the spinal surgery community.

20.    The spinal surgery industry is highly competitive, and Alphatec is one of Stryker Spine's direct competitors for spinal implants and related products.

21.    To sell its spinal implants and related products, Stryker Spine relies heavily on the distributors that it contracts with, and the agents and sales representatives of those distributors to cultivate, on Stryker Spine's behalf, relationships with surgeons and healthcare facilities.

22.    In some instances, Stryker Spine directly employs sales representatives to sell its products in a given territory.

23.    Whether direct Stryker Spine employees or contracted through a distributor (hereinafter collectively referred to as "Stryker Spine Sales

Representatives"), Stryker Spine Sales Representatives primarily are responsible for cultivating and growing relationships with surgeons in their territory. They also provide technical support and assistance to surgeons during surgeries, showcase Stryker Spine's products, and train surgeons on Stryker Spine's highly specialized and state-of-the-art spinal products and implants.

24.     Stryker Spine spends a significant amount of time and resources developing and maintaining long-term relationships with its customers. These relationships often take years to establish and are crucial to the success of Stryker Spine's business. Stryker Spine's Sales Representatives are the face of Stryker Spine to its clients. Stryker Spine's customers typically become very loyal to Stryker Spine through the Sales Representatives with whom they work due to the emphasis Stryker Spine puts on providing an exceptional level of customer service and investing time and effort in the relationships.

25.     Stryker Spine also spends a significant amount of time and resources training its Sales Representatives. Each Sales Representative is required to attend intensive training course on Stryker Spine's products and thereafter must attend various additional trainings and surgeon education forums to gain further exposure to Stryker Spine's products, new technologies, and other confidential information used to differentiate Stryker Spine's products from those of its competitors.

26.     As recognized by Alphatec's CEO, Pat Miles, the "Stryker [Spine] sales discipline" "prowess" and "sales force know-how" are of great value.

27.     Surgeons who use Stryker Spine products constitute a significant portion of Stryker Spine's customer base.  Stryker Spine invests substantial time and resources to build and maintain goodwill and long-term relationships with surgeons and hospitals.

28.     In terms of customer preferences, every surgeon has his or her own protocol in the operating room, and this protocol varies from surgeon to surgeon. A critical element in maintaining a strong customer relationship is the Sales Representative's knowledge of a surgeon's preferences and method of operating.

29.     Therefore, each Stryker Spine Sales Representative is responsible for maintaining a knowledge base of his/her customer's unique preferences and operating room protocol.  This knowledge base is not available to the public, is of great value to Stryker Spine, and would give any of Stryker's competitors who acquired such information improperly, such as Alphatec, an unfair competitive advantage.

30.     To protect its investment in its research and development, business strategies, reputation, goodwill, and confidential information, Stryker Spine requires its Distributors and Sales Representatives to execute confidentiality agreements and restrictive covenants which establish certain obligations owing to

8

Stryker Spine during the employment relationship, and certain reasonable post-employment contractual obligations owing to Stryker Spine thereafter.

31.     Specifically, the covenants not to disclose confidential information, not to compete, and not to solicit other company employees or affiliated independent contractors afford Stryker Spine the protection it requires to share its plans, pricing, strategies, customer lists, customer preferences and other trade secret information with its agents without fear that those individuals will join a competitor and use that knowledge and information to compete with Stryker Spine.

32.     Attached to its Distributor Agreements, which contain explicit confidentiality and non-competition provisions, is a customer list unique to each sales territory and Stryker Spine Sales Representative (hereinafter referred to as "Customer List").

**B.  Stryker Spine's Contractual Relationships With Its Distributors**

33.     KG, Haylett and D.E.D were all Distributors that contracted with Stryker Spine to distribute Stryker Spine products to doctors and healthcare facilities on their respective Customer Lists.

34.     Each Distributor entered into a comprehensive 40-page, three-year Distributor Agreement with Stryker Spine to be an exclusive distributor of Stryker Spine products to a defined list of doctors and healthcare facilities in either the Jacksonville or Jupiter, Florida region.

9

35.     The Distributor Agreements between Stryker Spine and these Distributors, each contained certain reasonable post-contractual obligations owing to Stryker Spine.

36.     The narrowly tailored post-contractual restrictive covenants were designed to protect Stryker Spine's goodwill, long standing customer relationships, sales representative relationships and Confidential Information, which is defined as follows:

> information disclosed to Representative, Representative Affiliates or any Workforce Member or known to Representative, Representative Affiliates or any Workforce Member as a consequence of or through the performance of Representative's or Principal's obligations, as applicable, under this Agreement (including, without limitation, information conceived, originated, discovered or developed by Representative, Principal, Representative Affiliate, or any Workforce Member), not generally known in the industry, about Stryker Spine's business, processes, apparatus, products, research, research programs, trade secrets, customers, customer lists, supplier and vendor identities, customer requirements, know how or intellectual property, marketing, pricing, financial data, forecasts, business plans, strategies or other confidential or proprietary information, and (ii) all terms, including financial terms, and conditions of this Agreement.

(Distributor Agreement, ¶11(b)(i)).

37.     The Distributor Agreements explicitly prohibit the disclosure of Confidential Information:

> During the Term and after any expiration or termination of this Agreement, Representative and Principal shall not (and shall ensure that each Representative Affiliate and Workforce Member does not) at any time directly or indirectly remove, possess, utilize or disclose to any individual, corporation, partnership or other entity any confidential information or trade secrets of or relating to Stryker Spine.

(Distributor Agreement, ¶11(b)).

38.     The Distributor Agreements also contain several post-contractual restrictions that each Distributor, through its principal agents, agreed to abide by for one year after the Agreement's termination ("Restricted Period"). (Id. at ¶11(a)).

39.     Each Distributor, through its principle agent(s), promised that during the Restricted Period it would not, in any capacity, directly or indirectly, manufacture, sell, service, offer for sale, or assist any other person or entity in manufacturing, selling, servicing or providing products, competitive or otherwise within a specified territory, as that term was defined within the agreement.  (Id. at ¶11).

40.     Each Distributor also agreed during the Restricted Period not to directly or indirectly "divert, entice or otherwise take away" from Stryker Spine the business or patronage of any client identified on the Customer List unique to

that Distributor or any customers that were serviced by the Distributor within two years of the termination of the Distributor Agreement. (Id. at ¶11(a)(ii)).

41.    Each Distributor's principle agent(s) further agreed during the Restricted Period not to work for or render services directly to a competitor of Stryker Spine or to solicit or induce any person engaged as an employee, independent contractor or agent of the Distributor or Stryker Spine to terminate his or her employment or business relationship with Stryker Spine.

42.    Moreover, under the terms of each Distributor Agreement, which was set to last three years, the Distributor could terminate the Agreement only upon providing notice of a material breach of the Agreement by Stryker Spine which Stryker Spine failed to cure within thirty (30) days' notice of the alleged material breach.

## C.  Stryker Spine Sales Representatives

43.    Under the terms of the KG, Haylett and D.E.D Distributor Agreements, each Distributor had an obligation to contract with sales representatives to market and sell Stryker Spine products and services.

44.    As required under the Distributor Agreement, each Sales Representative agreed to be bound by the same post-employment restrictive covenants that were contained in the Distributor Agreement.

45.     Specifically, each Sales Representative agreed that for one (1) year after the termination of their engagement as a sales representative, the sales representative would not "directly or indirectly manufacture, sell, service, offer for sale, or assist any other person or entity in manufacturing, selling, servicing or providing competitive products to customers (including, but not limited to, surgeons, and affiliated hospitals and clinics) of [ ] Stryker Spine that Representative learned of, serviced, solicited, sold to, or learned confidential information about or were within the same branch, territory or agency within which Representative worked during the two years prior to the date on which the Engagement Period ends."  (Addendum, 1.1).

**D.  Stryker Spine's Confidential and Proprietary Information**

46.     Stryker Spine's Sales Representatives forge significant and lasting relationships with the surgeons and medical facilities that purchase Stryker Spine products.

47.     Stryker Spine dedicates a significant amount of time and resources cultivating its client relationships and creating goodwill among its customers by, among other things, providing a high level of customer service and offering them continual training on Stryker Spine's state of the art products.  These relationships often take years to develop and are crucial to the success of Stryker Spine's business.

13

48.     In order to perform their responsibilities effectively, Stryker Spine's Distributors and Sales Representatives are given access to confidential, proprietary and trade secret information concerning:  (i) Stryker Spine's operations, products, pricing formulae, manufacturing processes, research and development activities, and analysis of competitive products; and (ii) Stryker Spine's customers, including, but not limited to, customer lists, customer preferences and operating protocols, solicitation strategies, pricing information, purchasing patterns, and applicable discount codes.

49.     This type of confidential, proprietary and trade secret information is not generally available to the public, is of great value to Stryker Spine and would give any of their competitors who acquired such information, including Alphatec, an unfair competitive advantage.

## E.  Alphatec's Unlawful Interference With Stryker Spine's Distributor Agreements

50.     Alphatec sells spinal products and services that compete with Stryker Spine's products and services. Therefore, Alphatec's products are competitive products as that term is used and/or defined in the Distributor Agreement.

51.     Beginning in June 2020, Alphatec began heavily recruiting KG's principle agents, William Lewers and Lucas Kessler, offering them large, lucrative contracts worth as much as $650,000 in order to breach KG's Distributor Agreement and leave Stryker Spine.

52.     After three months of Alphatec's persistent recruiting effort, including all-expense paid trips to California to visit Alphatec's headquarters and dinners with Alphatec's CEO, Pat Miles, on August 31, 2020, KG's Principle Agents, on behalf of themselves and KG, terminated the Distributor Agreement with Stryker Spine.  The termination was without cause, without notice and in breach of the Distributor Agreement.

53.     KG's principle agents terminated the Distributor Agreement to begin working for Alphatec, a direct competitor of Stryker Spine.

54.     Alphatec recruited KG, Lewers and Kessler with full knowledge of the post-contractual confidentiality, non-competition and non-solicitation obligations they owed to Stryker Spine, yet Alphatec had no intention of ensuring Lewers, Kessler or any KG Sales Representative abided by their legal obligations.

55.     On September 1, 2020, with full knowledge of KG's and the former Stryker Spine Sales Representatives' obligations under the Distributor Agreement, Alphatec hired five of Stryker Spine's Sales Representatives in the Florida region to gain confidential and proprietary information that would give Alphatec a competitive advantage and be used to improperly poach Plaintiff's clients.

56.     Upon information and belief, Alphatec used the same playbook with Haylett and D.E.D.  Alphatec heavily recruited Haylett's and D.E.D.'s principle agents, Dustin Haylett and Dominic D'Abate, offering them lucrative contracts in

exchange for their agreement to breach Haylett's and D.E.D.'s Distributor Agreements and leave Stryker Spine.

57. On November 30, 2020, Haylett's and D.E.D.'s Principle Agents, on behalf of themselves and their companies, terminated the Distributor Agreements with Stryker Spine to begin working for Alphatec. The termination was without cause, without notice and in breach of the respective Distributor Agreements.

58. Alphatec recruited Haylett and D.E.D. with full knowledge of the post-contractual confidentiality, non-competition and non-solicitation obligations they owed to Stryker Spine, yet Alphatec had no intention of ensuring that their principle agents or any of their sales representative abided by their legal obligations.

59. Upon information and belief, each former Stryker Spine Sales Representative was hired by Alphatec as a 1099 indirect sales representative, with a plan of converting the former Stryker Spine Distributor entities into Alphatec distributors.

60. The services that the former Stryker Spine Sales Representatives are performing on Alphatec's behalf are identical to the services they performed on behalf of Stryker Spine.

61.     Upon information and belief, certain of Stryker Spine's former clients refer to the former Stryker Spine Sales Representatives as the new AT Stryker Team.

62.     Alphatec's tortious actions caused KG, Haylett and D.E.D. and the former Stryker Spine Sales Representatives to violate the post-contractual non-compete obligations that they owe to Stryker Spine, and pose a significant risk that Stryker Spine's Confidential Information has been or will be used to aid in or create unfair competition favoring Alphatec.

63.     Specifically, Lewers, Kessler, D'Abate and Haylett, in addition to former Stryker Spine Sales Representatives, David Hyland, Allison Hogge, Paul Caron and Chris Thomas, are selling competitive products for Alphatec, sharing Stryker Spine's confidential and proprietary information with Alphatec Sales Representatives, and soliciting Stryker Spine's customers to become clients of Alphatec on behalf of Alphatec, all in violation of their post-contractual non-competition obligations owed to Stryker Spine.

64.     For example, since September 2020, Kessler, Hyland, Caron, and Hogge have regularly assisted surgeons on their respective Stryker Spine Customer Lists in spine fusion surgeries on behalf of Alphatec.

65.     Likewise, starting in December 2020 and continuing thereafter, D'Abate, Haylett and Thomas worked together to assist surgeons included on their Stryker Spine Customer Lists in spine fusion surgeries on behalf of Alphatec.

66.     Alphatec engaged these former Stryker Spine Sales Representatives to improperly share their Stryker Spine Customer Lists and knowledge of customer preferences with other Alphatec Sales Representatives, and consult on spinal fusion cases for surgeons on the Stryker Spine Customer List, while Alphatec has worked behind the scenes to facilitate the transition of Stryker Spine's customer's to Alphatec.

67.     Upon information and belief, Alphatec employees have assisted the former Stryker Spine Sales Representatives in scheduling surgeries with surgeons on their Stryker Spine Customer Lists and in showcasing Alphatec products to surgeons on the Stryker Spine Customer Lists, including assistance from members of Alphatec's senior leadership.

68.     With full knowledge of the severity and illegality of its actions, Alphatec representatives employed a practice of masking the former Sales Representative's improper actions, including their involvement with surgeons on the Stryker Spine Customer List by bcc'ing them on e-mail correspondence so their names are not readily identifiable when reviewing Alphatec's records.

**F.  Stryker Spine Has Lost Business to Alphatec**

69.     Upon information and belief, Alphatec maintains a target list of customers who Alphatec seeks to poach from Stryker Spine using the knowledge its former Sales Representatives gained from working as their competitor.

70.     Since Alphatec contracted with Lewers, Kessler, Caron, Hogge, Hyland, D'Abate, Haylett and Thomas, Stryker Spine has lost significant business to Alphatec, which is a direct result of Alphatec's unlawful actions.

71.     Numerous surgeons in the Jacksonville and Jupiter, Florida regions, who regularly scheduled surgical procedures using Stryker Spine products in the past, have not scheduled or have significantly reduced their use of Stryker Spine products in surgical procedures since Alphatec recruited KG, Haylett and D.E.D. and the former Stryker Spine Sales Representatives to breach their respective obligations to Stryker Spine.

72.      Spinal sales in the Jacksonville and Jupiter, Florida regions have significantly declined since September 1, 2020 and December 1, 2020, respectively, by as much as 90% for some clients.

73.     This significant drop in Stryker Spine's sales has been directly caused by Alphatec's tortious interference.

74.     Upon information and belief, Alphatec's actions are not just limited to the Florida region, but are part of a long-standing and larger-scale plan to impact Stryker Spine's customers across the nation.

19

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACT/DAMAGES

75.     Stryker Spine repeats and realleges the allegations contained in paragraphs 1 through 74 above as though fully set forth herein.

76.     As set forth above, the Distributor Agreements and their addendums, as signed by the principle agents of KG, Haylett and D.E.D and their respective Sales Representatives, are valid and enforceable contracts which contain reasonable post-contractual obligations owing to Stryker Spine.

77.     Despite the post-contractual restrictions and obligations imposed upon KG, Haylett and D.E.D, and their respective agents, which Alphatec was well aware of, Alphatec assisted with and facilitated the breach of the non-competition and non-solicitation obligations owed to Stryker Spine for its own benefit.

78.     As a result of Alphatec's tortious interference, Stryker Spine has been damaged. Stryker Spine seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and interest.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT/INJUNCTIVE RELIEF

79.     Stryker Spine repeats and realleges the allegations contained in paragraphs 1 through 74 above as though fully set forth herein.

80.     As set forth above, the Distributor Agreements and their addendums, as signed by the principle agents of KG, Haylett and D.E.D and their respective

20

Sales Representatives, are valid and enforceable contracts which contain reasonable post-contractual obligations owing to Stryker Spine.

81.    Despite the post-contractual restrictions and obligations imposed upon KG, Haylett and D.E.D, and their respective agents, which Alphatec was well aware of, Alphatec assisted with and facilitated the breach of the non-competition and non-solicitation obligations owed to Stryker Spine for its own benefit.

82.    As a result of Alphatec's tortious interference, Stryker Spine has been irreparably injured, and continues to face irreparable injury. Stryker Spine is threatened with losing the value of its confidential information, customer relationships and goodwill.

83.    Stryker Spine has no adequate remedy at law.

84.    An injunction will serve the public interest.

85.    The balance of hardships tips in its favor of granting a permanent injunction.

86.    Stryker Spine is entitled to an award of attorneys' fees and costs it has incurred and will continue to incur in bringing and prosecuting this action.

COUNT III
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC
ADVANTAGE:
HOWMEDICA'S CUSTOMERS/DAMAGES**

87.    Stryker Spine repeats and realleges the allegations contained in paragraphs 1 through 74 above as though fully set forth herein.

21

88.     Until the events giving rise to this action, Stryker Spine had maintained valid business relationships with its customers and/or prospective customers in the Jacksonville and Jupiter, Florida regions.

89.     Stryker Spine's relationships generated good will among these customers and created an expectation of future business.  The knowledge Stryker Spine has gained about these customers and the business terms of these relationships are confidential and proprietary business information.

90.     Alphatec used these long-standing customer relationships, including the unique knowledge former Stryker Spine Sales Representatives possess about these customers and the business terms of Stryker Spine's relationships with these customers in order to intentionally and unjustifiably interfere with Stryker Spine's future business relationships and give Alphatec a competitive advantage.

91.     Furthermore, by Alphatec causing each Distributor to abruptly, and without notice of cause, terminate its Distributor Agreement and then Alphatec immediately contract with eight former Stryker Sales Representatives to solicit surgeons and hospitals in Florida on behalf of Alphatec, Stryker Spine was denied the opportunity to preserve its relationships with these surgeons and hospitals without the interference of Alphatec.

92.     As a result of Alphatec's tortious interference with Stryker Spine's business relationships with its customers and/or prospective customers, Stryker

Spine has been damaged and faces irreparable injury.  Stryker Spine seeks actual,

incidental, compensatory, punitive and consequential damages, along with its

reasonable attorneys' fees and interest.

COUNT IV
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC
ADVANTAGE:
HOWMEDICA'S CUSTOMERS/INJUNCTIVE RELIEF**

93.     Stryker Spine repeats and realleges the allegations contained in

paragraphs 1 through 74 above as though fully set forth herein.

94.     Until the events giving rise to this action, Stryker Spine had

maintained valid business relationships with its customers and/or prospective

customers in the Jacksonville and Jupiter, Florida regions.

95.     Stryker Spine's relationships generated good will among these

customers and created an expectation of future business.  The knowledge Stryker

Spine has gained about these customers and the business terms of these

relationships are confidential and proprietary business information.

96.     Alphatec used these long-standing customer relationships, including

the unique knowledge former Stryker Spine Sales Representatives possess about

these customers and the business terms of Stryker Spine's relationships with these

customers in order to intentionally and unjustifiably interfere with Stryker Spine's

future business relationships and give Alphatec a competitive advantage.

97.    Furthermore, by Alphatec causing each Distributor to abruptly, and without notice of cause, terminate its Distributor Agreement and then Alphatec immediately contract with eight former Stryker Sales Representatives to solicit surgeons and hospitals in Florida on behalf of Alphatec, Stryker Spine was denied the opportunity to preserve its relationships with these surgeons and hospitals without the interference of Alphatec.

98.    As a result of Alphatec's tortious interference, Stryker Spine has been irreparably injured, and continues to face irreparable injury. Stryker Spine is threatened with losing the value of its confidential information, customer relationships and goodwill.

99.    Stryker Spine has no adequate remedy at law.

100.    An injunction will serve the public interest.

101.    The balance of hardships tips in its favor of granting a permanent injunction.

102.    Stryker Spine is entitled to an award of attorneys' fees and costs it has incurred and will continue to incur in bringing and prosecuting this action.

## COUNT V
## VIOLATION OF DEFEND TRADE SECRETS ACT

103.    Stryker Spine repeats and realleges the allegations contained in paragraphs 1 through 74 above as though fully set forth herein.

104.   Stryker manufactures its products, tools and instruments and conducts its research and development in various locations throughout the United States and sells, in interstate commerce, to its customers nationwide through both a dedicated force of Sales Representatives and third party distributors.

105.   Stryker Spine's Distributors and Sales Representatives are given access to confidential, proprietary and trade secret information concerning Stryker Spine's:  (i) products, tools and instruments, including its research and development; and (ii) customers, including, but not limited to, customer lists, customer preferences and operating protocols, solicitation strategies, pricing information, purchasing patterns, and applicable discount codes.

106.   This information is of independent economic value, not available to the public, not readily ascertainable by proper means, and could convey an economic benefit to another company that obtains it, including Alphatec.

107.   This information constitutes a trade secret.

108.   Stryker Spine undertakes reasonable measures to maintain the secrecy of its trade secrets, including confidentiality agreements and restrictive covenants that applied to the Stryker Spine Sales Representatives recruited by Alphatec.

109.   Stryker Spine's trade secrets have been misappropriated by Alphatec through willful, malicious and improper means for its own benefit.

110.   Alphatec has purposefully contracted with Stryker Spine's former Sales Representatives to gain access to Stryker Spine's Customer Lists, customer purchasing patterns, product and surgical preferences, which Alphatec then shared with members of Alphatec's management and sales representatives.

111.   Upon information and belief, Alphatec is using and taking advantage of Stryker Spine's trade secrets to unjustifiably interfere with Stryker Spine's business and using Stryker Spine's trade secrets to gain an unfair competitive advantage for Alphatec.

112.   Alphatec's actions constitute a willful and malicious violation of the DTSA, 18 U.S.C.A. § 1836, *et seq.*

113.   As a result of Alphatec's violations of the DTSA, Stryker Spine has been injured and will continue to be damaged by losses of, among other things, customers, revenues, valuable proprietary information and good will.

COUNT VI
**VIOLATION OF FLORIDA UNIFORM TRADE SECRETS ACT**

114.   Stryker Spine repeats and realleges the allegations contained in paragraphs 1 through 74 above as though fully set forth herein.

115.   Stryker Spine's Distributors and Sales Representatives are given access to confidential, proprietary and trade secret information concerning Stryker Spine's:  (i) products, tools and instruments, including its research and development; and (ii) customers, including, but not limited to, customer lists,

26

customer preferences and operating protocols, solicitation strategies, pricing information, purchasing patterns, and applicable discount codes.

116.   This information is of independent economic value, not available to the public, not readily ascertainable by proper means, and could convey an economic benefit to another company that obtains it, including Alphatec.

117.   This information constitutes a trade secret.

118.   Stryker Spine undertakes reasonable measures to maintain the secrecy of its trade secrets, including confidentiality agreements and restrictive covenants that applied to the Stryker Spine Sales Representatives recruited by Alphatec.

119.   Stryker Spine's trade secrets have been misappropriated by Alphatec through willful, malicious and improper means for its own benefit.

120.   Alphatec has purposefully contracted with Stryker Spine's former Sales Representatives to gain access to Stryker Spine's Customer Lists, customer purchasing patterns, product and surgical preferences, which Alphatec then shared with members of Alphatec's management and sales representatives.

121.   Upon information and belief, Alphatec is using and taking advantage of Stryker Spine's trade secrets to unjustifiably interfere with Stryker Spine's business and using Stryker Spine's trade secrets to gain an unfair competitive advantage for Alphatec.

122.   Alphatec's actions were taken in bad faith and constitute a willful and malicious violation of the FUTSA, Fla. Stat. Ann. § 688.001, *et seq.*

123.   As a result of Alphatec's violations of the FUTSA, Stryker Spine has been injured and will continue to be damaged by losses of, among other things, customers, revenues, valuable proprietary information and good will.

## **PRAYER FOR RELIEF**

WHEREFORE, Stryker Spine seeks judgment in its favor and an Order against Defendants that grants the following relief:

A.   An award of Stryker Spine's actual, incidental, compensatory, and consequential damages to be proven at trial;

B.   An award of Stryker Spine's costs and expenses incurred herein, including reasonable attorneys' fees and interest;

C.   Disgorgement of all revenues, profits and other sums received by Alphatec due to its unlawful activity and award it to Stryker Spine;

D.   Entry of a permanent injunction barring further unlawful behavior during the three year term of the applicable Distributor Agreements and the one year post-Agreement time period;

E.   Award to Stryker Spine exemplary or punitive damages assessed against Defendant pursuant to the DTSA, 18 U.S.C. § 1836, *et seq.* and the FUTSA, § 688.004(2), for Defendant's willful and malicious conduct; and

F.   An award to Stryker Spine for such further relief as the Court deems necessary and just.

## <u>REQUEST FOR A JURY TRIAL</u>

Plaintiff, Howmedica Osteonics Corp., by counsel, hereby requests that the

above-captioned matter be set for a jury trial.

Dated:  August 13, 2021                    PROSKAUER ROSE LLP

                                           By:  ___*/s/ Jurate Schwartz*___
                                                Jurate Schwartz
                                                jschwartz@proskauer.com
                                                Proskauer Rose LLP
                                                2255 Glades Road, Suite 421A
                                                Boca Raton, FL 33431
                                                jschwartz@proskauer.com
                                                florida.labor@proskauer.com
                                                Tel: (561) 241-7400

                                                Joseph C. O'Keefe (*pro hac* to be
                                                submitted)
                                                jokeefe@proskauer.com
                                                Edna D. Guerrasio (*pro hac* to be
                                                submitted)
                                                eguerrasio@proskauer.com
                                                Proskauer Rose LLP
                                                Eleven Times Square
                                                New York, NY 10036
                                                Tel: (212) 969-3000

                                                *Attorneys for Howmedica Osteonics*
                                                *Corp., a subsidiary of Stryker Corp.*