United States District Court
Middle District of Florida
Jacksonville Division

**HOWMEDICA OSTEONICS CORP.,**

*Plaintiff,*

v.

**NO. 3:21-cv-789-BJD-PDB**

**ALPHATEC SPINE, INC.,**

*Defendant.*

---

# Report and Recommendation

Howmedica Osteonics Corp., a subsidiary of Stryker Corporation, sues Alphatec Spine, Inc., contending Alphatec tortiously interfered with contracts and business relations and violated the federal Defend Trade Secrets Act (DTSA) and the Florida Uniform Trade Secrets Act (UTSA). D1.

Alphatec moves to dismiss the DTSA and UTSA claims or to require Howmedica to state the claims more definitely, contending Howmedica's alleged facts fail to establish plausible claims. D15. Alphatec alternatively moves to dismiss the tortious interference claims, contending UTSA displaces them. D15. Howmedica opposes the motion. D17.

The motion was referred to the undersigned for a report and recommendation. D31. The parties have exchanged discovery here and in a related action elsewhere. D32 at 2. They must participate in mediation by the end of July. D34 at 2. They must complete discovery by the end of September. D34 at 1. The trial term begins next April. D34 at 2.

## I.  Complaint

In the complaint, Howmedica alleges these facts. Some allegations are quoted verbatim, but for readability, quotation marks are used sparingly.

Howmedica is a New Jersey corporation regularly conducting business in Jacksonville and Jupiter, Florida. D1 ¶ 11. Through its spine division, referred to here as "Stryker," Howmedica is a global leader in the development, manufacture, and sale of spinal implants, instruments, and related products and services. D1 ¶ 17.

Stryker conducts research and invents, designs, manufactures, and sells nationwide a range of "state of the art" spinal implants and other products that make surgeries and recoveries simpler, faster, and more effective. D1 ¶¶ 18, 23, 104. Stryker's products have broad appeal and acceptance in the spinal-surgery community and general marketplace. D1 ¶ 19.

Most of Stryker's customers are surgeons. D1 ¶ 27. Each surgeon has a unique operating-room protocol. D1 ¶ 28. To sell its products and cultivate relationships with surgeons and healthcare facilities, Stryker relies on distributors and their agents and sales representatives. D1 ¶ 21. Stryker also directly employs sales representatives. D1 ¶ 22.

Sales representatives cultivate relationships with surgeons in assigned territories, showcase Stryker's products, provide technical support and assistance to surgeons during surgeries, and train surgeons on Stryker's products. D1 ¶¶ 23, 46. They must know surgeons' preferences and protocols, which are publicly unavailable and greatly valued by Stryker. D1 ¶¶ 28, 29. To the surgeons, the sales representatives are the "face of Stryker." D1 ¶ 24. Through them, the surgeons usually become very loyal to Stryker. D1 ¶ 24.

Stryker spends significant time and resources to develop and maintain the relationships, including by training its sales representatives and providing the surgeons exceptional customer service and continued training on Stryker products. D1 ¶¶ 24, 25, 27, 47. The relationships often take years to establish and are crucial to Stryker's success. D1 ¶¶ 9, 24, 47.

To know Stryker's products, new technologies, and other confidential information differentiating Stryker's products from its competitors' products, sales representatives must attend an initial intensive training course and later training courses and surgeon-education forums. D1 ¶ 25. To perform their responsibilities, Stryker's distributors and sales representatives are given access to information about Stryker's operations, products, pricing formulae, manufacturing processes, research and development activities, analyses of competitive products, customers, customer lists, customer preferences, customer operating protocols, solicitation strategies, pricing information, purchasing patterns, and discount codes. D1 ¶ 48, 105, 115. This information is generally unavailable to the public and of great value to Stryker, and Stryker treats the information as a trade secret and otherwise confidential and proprietary. D1 ¶¶ 49, 106, 116.

The spinal-surgery industry is highly competitive. D1 ¶ 20. To protect its investment in research, development, business strategies, reputation, goodwill, and confidential information, Stryker requires distributors and sales representatives to execute confidentiality agreements and restrictive covenants. D1 ¶ 30. The distributor agreements include a customer list unique to each sales representative and territory. D1 ¶ 32. The covenants give Stryker the protection needed to share its plans, pricing, strategies, customer lists, customer preferences, and the like with its agents without fear they will join a competitor and use the information to compete with Stryker. D1 ¶ 31.

KG Surgical & Associates, Haylett Inc., and D.E.D. of South Florida, Inc., contracted with Stryker to distribute Stryker products to surgeons and healthcare facilities on customer lists. D1 ¶¶ 2, 33. Each distributor entered into a three-year agreement with Stryker to exclusively distribute Stryker products to specific doctors and healthcare facilities in Jacksonville or Jupiter. D1 ¶¶ 34, 42. The distributor could terminate the agreement only by providing Stryker notice of a material breach and only if Stryker failed to cure the breach within thirty days. D1 ¶ 42.

The agreements prohibit the representatives and principals from disclosing Stryker's trade secrets and other confidential information and require the representatives and principals to ensure nondisclosure by affiliates and workers. D1 ¶ 37. The agreements define "confidential information" as

> information disclosed to Representative, Representative Affiliates or any Workforce Member or known to Representative, Representative Affiliates or any Workforce Member as a consequence of or through the performance of Representative's or Principal's obligations, as applicable, under this Agreement (including, without limitation, information conceived, originated, discovered or developed by Representative, Principal, Representative Affiliate, or any Workforce Member), not generally known in the industry, about Stryker's business, processes, apparatus, products, research, research programs, trade secrets, customers, customer lists, supplier and vendor identities, customer requirements, know how or intellectual property, marketing, pricing, financial data, forecasts, business plans, strategies or other confidential or proprietary information, and (ii) all terms, including financial terms, and conditions of this Agreement.

D1 ¶ 36.

To protect Stryker's goodwill, customer relationships, and confidential information, the agreements contain post-contractual restrictions that the distributors through their principal agents agree to follow for one year after termination. D1 ¶¶ 35, 38. Each distributor agreed that, during the restricted

4

period, the distributor "would not, in any capacity, directly or indirectly, manufacture, sell, service, offer for sale, or assist any other person or entity in manufacturing, selling, servicing or providing products, competitive or otherwise within a specified territory, as that term was defined within the agreement." D1 ¶ 39. Each distributor further agreed that, during the restricted period, the distributor would not directly or indirectly "divert, entice or otherwise take away" from Stryker the business or patronage of any client identified on the customer list unique to that distributor or any customers serviced by the distributor within two years of the termination of the agreement. D1 ¶ 40. Each distributor's principal agent or agents also agreed that, during the restricted period, the agent would not "work for or render services directly to a competitor of Stryker or … solicit or induce any person engaged as an employee, independent contractor or agent of the [d]istributor or Stryker to terminate his or her employment or business relationship with Stryker." D1 ¶ 41.

Under their distributor agreements, KG, Haylett, and D.E.D had "to contract with sales representatives to market and sell Stryker products and services." D1 ¶¶ 43, 45. In turn, each sales representative agreed that for a year after the termination of engagement as a sales representative, the sales representative would not "directly or indirectly manufacture, sell, service, offer for sale, or assist any other person or entity in manufacturing, selling, servicing or providing competitive products to customers (including, but not limited to, surgeons, and affiliated hospitals and clinics) of … Stryker that [r]epresentative learned of, serviced, solicited, sold to, or learned confidential information about or were within the same branch, territory or agency within which [r]epresentative worked during the two years prior to the date on which the [e]ngagement [p]eriod ends." D1 ¶ 45; *see also* D1 ¶ 3 (alleging the agreements prohibit the principal agents and sales representatives from

competing with Stryker for at least one year after the termination of their engagement).

Alphatec is a Delaware and California corporation regularly conducting business in Jacksonville and Jupiter. D1 ¶ 12. Alphatec is a direct competitor of Stryker for spinal implants and related products. D1 ¶¶ 20, 50.

Alphatec's chief executive officer, Pat Miles, publicly stated he intends to rely on the "Stryker prowess from a sales force know-how standpoint" to build Alphatec's client base and salesforce. D1 ¶ 5; *see also* D1 ¶ 26 (similar allegation).

Beginning in June 2020, Alphatec began heavily recruiting KG's principal agents—William Lewers and Lucas Kessler—offering them lucrative contracts worth as much as $650,000 to breach their distributor agreements and leave Stryker. D1 ¶ 51. Alphatec recruited them knowing they had post-contractual obligations to Stryker and with no intention of ensuring they abided by those obligations. D1 ¶ 54.

On August 31, 2020, after months of persistent recruiting, including all-expenses-paid trips to California to dine with Miles and visit Alphatec's headquarters, Lewers and Kessler—on behalf of KG and themselves—terminated the distributor agreement with Stryker to work for Alphatec. D1 ¶¶ 52, 53. The termination was without notice, without cause, and in breach of the distributor agreement. D1 ¶ 52.

On September 1, 2020, Alphatec hired five Stryker sales representatives in the Florida region "to gain confidential and proprietary information that would give Alphatec a competitive advantage and be used to improperly poach

[Howmedica's] clients." D1 ¶ 55. Alphatec hired them knowing their obligations under the distributor agreement. D1 ¶ 55.

Alphatec used the same "playbook" with Haylett and D.E.D. D1 ¶ 56 (on information and belief). Alphatec heavily recruited their principal agents—Dustin Haylett and Dominic D'Abate—and offered them lucrative contracts to breach their distributor agreements and leave Stryker. D1 ¶ 56. Alphatec recruited them knowing they had post-contractual obligations to Stryker and with no intention of ensuring they abided by those obligations. D1 ¶ 58.

On November 30, 2020, Haylett and D'Abate, on behalf of themselves and their companies, terminated the distributor agreements with Stryker to work for Alphatec. D1 ¶ 57. The termination was without notice, without cause, and in breach of the distributor agreements. D1 ¶ 57.

Alphatec hired the Stryker sales representatives as 1099 indirect sales representatives with a plan to convert them into Alphatec distributors. D1 ¶ 59 (on information and belief).

The former Stryker sales representatives now are performing on Alphatec's behalf services identical to those they performed on Stryker's behalf. D1 ¶ 60. Some of Stryker's former clients refer to them as the "new AT Stryker Team." D1 ¶ 61 (on information and belief).

Alphatec's actions caused KG, Haylett, D.E.D., and the former Stryker sales representatives to violate their post-contractual non-compete obligations to Stryker and pose a significant risk that Stryker's confidential information has been or will be used to unfairly compete. D1 ¶ 62.

Lewers, Kessler, D'Abate, Haylett, and former Stryker sales representatives David Hyland, Allison Hogge, Paul Caron, and Chris Thomas

are selling competing products for Alphatec, sharing Stryker's confidential and proprietary information with Alphatec sales representatives, and soliciting Stryker's customers to become Alphatec's customers. D1 ¶ 63. Since September 2020, Kessler, Hyland, Caron, and Hogge have regularly assisted surgeons on their Stryker customer lists in spine-fusion surgeries on behalf of Alphatec. D1 ¶ 64. Since December 2020, D'Abate, Haylett, and Thomas worked together to assist surgeons on their Stryker customer lists in spine-fusion surgeries on behalf of Alphatec. D1 ¶ 65. Alphatec engaged the former Stryker sales representatives to improperly share their Stryker customer lists and knowledge of customer preferences with other Alphatec sales representatives and to consult on spine-fusion cases for surgeons on the Stryker customer list. D1 ¶ 66. Alphatec has worked behind the scenes to facilitate the transition of Stryker's customers to Alphatec. D1 ¶ 66.

Alphatec employees, including senior leadership, have assisted the former Stryker sales representatives in scheduling surgeries with surgeons on their Stryker customer lists and in showcasing Alphatec products to surgeons on the Stryker customer lists. D1 ¶ 67 (on information and belief). Alphatec representatives masked the former sales representatives' actions, including their involvement with surgeons on the Stryker customer list, by "bcc'ing" them on e-mails so their names are not readily identifiable when reviewing Alphatec's records. D1 ¶ 68.

Alphatec maintains a target list of customers it seeks to poach from Stryker using the knowledge the sales representatives gained from working for Stryker. D1 ¶ 69 (on information and belief).

Since Alphatec contracted with Lewers, Kessler, Caron, Hogge, Hyland, D'Abate, Haylett, and Thomas, Stryker has lost significant business to Alphatec. D1 ¶ 70. Many surgeons in the Jacksonville and Jupiter regions who

in the past regularly scheduled surgical procedures using Stryker products have not scheduled or have significantly reduced their use of Stryker products in surgical procedures. D1 ¶ 71. Stryker's spinal-product sales in the Jacksonville and Jupiter regions have significantly declined since September 1 and December 1, 2020, by as much as ninety percent for some clients. D1 ¶¶ 6, 72. Stryker's Florida sales force has been significantly reduced. D1 ¶ 4. Alphatec has targeted Stryker's customers and employees and has acquired a valuable roadmap for designing and improving its own products, customer relationships, and goodwill. D1 ¶ 9.

Alphatec's actions are part of a long-standing and larger-scale plan to impact Stryker's customers across the nation. D1 ¶¶ 7, 74 (on information and belief). Alphatec's leadership has touted that nine of its eleven senior sales leaders responsible for recruiting sales representatives across the country came from Stryker and are the "baseline ingredient of Alphatec's 'Disciplined Approach to Service.'" D1 ¶ 8. Alphatec aims to unfairly shortcut its own success at Stryker's expense. D1 ¶ 9. Howmedica warned Alphatec multiple times about its asserted unlawful conduct, but Alphatec nevertheless has ramped up its recruitment efforts. D1 ¶ 10.

Howmedica brings six claims for relief. Howmedica sues Alphatec for damages (count I) and injunctive relief (count II) for allegedly tortiously interfering with the distributor agreements and addenda with KG, Haylett, and D.E.D. and their sales representatives. D1 ¶¶ 75–86. Howmedica sues Alphatec for damages (count III) and injunctive relief (count IV) for allegedly tortiously interfering with Howmedica's prospective economic advantage. D1 ¶¶ 87–102. Howmedica sues Alphatec for alleged violations of DTSA, 18 U.S.C. §§ 1831–39 (count V), and UTSA, Fla. Stat. §§ 688.001–688.009 (count VI). D1 ¶¶ 103–23.

Howmedica demands damages, including exemplary or punitive damages; disgorgement of revenues and profits; a permanent injunction "barring further unlawful behavior" during the contractual terms; expenses and costs, including attorney's fees; and "such further relief" as the Court considers "necessary and just." D1 at 28.

## II.   Law and Analysis

### A.   *Does the complaint state DTSA and UTSA claims on which relief can be granted?*

In moving to dismiss the claims under DTSA and UTSA or to require Howmedica to state the claims more definitely, Alphatec argues the claims are a "haze of generalized and conclusory allegations" that fail to describe "what" and "how." D15 at 2. According to Alphatec, Howmedica "references broad categories of information that are so generalized as to be meaningless[.]" D15 at 2. Alphatec asks, "What information? Shared with whom? How or when was it shared?" and argues Alphatec "should not have to use the time and expense of … discovery to uncover the fundamental basics" of the trade-secret allegations. D15 at 2.

Howmedica responds Alphatec's argument is "baseless," pointing to allegations in the complaint about the confidential information Alphatec misappropriated, including customer lists and information about the customers such as preferences, operating protocols, and purchasing patterns that Florida law recognizes as trade secrets. D17 at 3.

Under federal procedural law, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pleading "special matters" requires more; specifically, to

allege fraud or mistake, a party must state the circumstances constituting the fraud or mistake "with particularity." Fed. R. Civ. P. 9(b).

A party can move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To decide this type of motion, a court may consider only the complaint allegations, anything attached to the complaint, anything extrinsic to the complaint central to the claim and without challenge to its authenticity, and any judicially noticeable facts. *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015). The court must accept factual allegations as true and construe them in the light most favorable to the non-moving party. *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012). And the court must draw all reasonable inferences in the non-moving party's favor. *Omar ex rel. Cannon v. Lindsey*, 334 F.3d 1246, 1247 (11th Cir. 2003).

The United States Supreme Court interpreted the federal pleading rules in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Under *Iqbal* and *Twombly*, a complaint need not include detailed factual allegations but must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Labels, conclusions, formulaic recitations of the elements, and "naked" assertions are insufficient. *Id.* A complaint "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (internal quotation marks and quoted authority omitted). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* Plausibility differs from probability, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

If the pleaded facts are "merely consistent with" liability, the complaint "stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks and quoted authority omitted). Stated another way, "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal quotation marks and quoted authority omitted).

When applying the plausibility standard, a court should undertake a "two-pronged approach." *Id.* First, the court should identify and disregard legal conclusions not entitled to the assumption of truth. *Id.* Second, the court should identify and assume the truth of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." *Id.* A court need not accept as true an allegation made on "information and belief" if the factual allegations are insufficient to make the statement plausible. *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013).

Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

"A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e); *see Gilbert v. Daniels*, 624 F. App'x 716, 718 (11th Cir. 2015) ("Where allegations are vague and ambiguous and the defendants and court must guess at precisely what the

claims are, the court should require the plaintiff to replead his claims."). "The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired." Fed. R. Civ. P. 12(e).

A federal court applies federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). The federal pleading rules and standards, including the Supreme Court's interpretation of them in *Iqbal* and *Twombly*, prevail in civil actions whether based on state or federal law. *Tannerite Sports, LLC v. NBCUniversal News Grp., a div. of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017); *see also Dan-Harry v. PNC Bank, N.A.*, No. 17-136 WES, 2018 WL 1083581, \*3 (D.R.I. 2018) (holding that, consistent with the *Erie* doctrine, federal courts must apply *Iqbal* and *Twombly* even where state law controls substantive claims).

UTSA creates a state cause of action for misappropriation of trade secrets. Fla. Stat. §§ 688.001–688.009. To prove a claim under UTSA, a party must show it possessed a trade secret and the secret was misappropriated. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1310 (11th Cir. 2020).

UTSA defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process that" derives "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Fla. Stat. § 688.002(4). UTSA defines "misappropriation" as:

> (a)   Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b)   Disclosure or use of a trade secret of another without express or implied consent by a person who:

    1.   Used improper means to acquire knowledge of the trade secret; or

    2.   At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

        a.   Derived from or through a person who had utilized improper means to acquire it;

        b.   Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        c.   Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    3.   Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2).

"DTSA creates a federal cause of action that largely mirrors []UTSA." *Compulife*, 959 F.3d at 1311 n.13 (citing 18 U.S.C. § 1836(b)(1)).

"A customer list can constitute a 'trade secret' where the list is acquired or compiled through the industry of the owner of the list and is not just a compilation of information commonly available to the public." *Bridge Fin., Inc. v. J. Fischer & Assocs., Inc.*, 310 So. 3d 45, 48 (Fla. 4th DCA 2020) (quoted authority omitted). "To qualify as a trade secret, there must be evidence that a customer list was the product of great expense and effort, that it included information that was confidential and not available from public sources, and that it was distilled from larger lists of potential customers into a list of viable customers for a unique business." *Id.* (cleaned up) (quoted authority omitted).

Whether an item is a trade secret is "normally resolved by a fact finder after full presentation of evidence from each side." *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288–89 (5th Cir. 1978). "This is because a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectable secret." *Digiport, Inc. v. Foram Dev. BFC, LLC*, 314 So. 3d 550, 553 (Fla. 3d DCA 2020) (internal quotation marks and quoted authority omitted).

"Pleading trade secrets can be difficult." *Verbena Prods. LLC v. Del Toro*, No. 22-20218-CIV-Scola, 2022 WL 910666, at *2 (S.D. Fla. Mar. 29, 2022). "Courts cannot expect plaintiffs to divulge all the details of [their] confidential and proprietary information in their complaints—particularly as plaintiffs seek to protect such proprietary information's value, which is derived from its secrecy." *Id.* (internal quotation marks and quoted authority omitted).

Here, undertaking the two-pronged approach (i.e., identifying and disregarding legal conclusions not entitled to a presumption of truth and identifying and assuming the truth of the well-pleaded factual allegations) and drawing on judicial experience and common sense, the well-pleaded factual allegations plausibly give rise to entitlement to relief for trade-secret misappropriation under DTSA and UTSA. Howmedica provides more than labels, conclusions, formulaic recitations of the elements, and "naked" assertions; Howmedica "pleads factual content that allows the court to draw the reasonable inference that [Alphatec] is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678 (quoted). Moreover, the allegations are not so vague or ambiguous that Alphatec cannot reasonably prepare a response.

The allegations include that Alphatec induced Stryker's sales representatives to leave Stryker and share Stryker's customer lists, customer "purchasing patterns," customer "preferences," customer "operating room protocol," "solicitation strategies," "pricing formulae," "manufacturing processes," and analyses of competing products. D1 ¶¶ 3, 29, 31, 48, 54, 58, 62, 91, 97. The allegations further include that, on information and belief, Alphatec employees, aided by Alphatec senior leadership, helped the former Stryker sales representatives schedule surgeries with, and showcase Alphatec products to, surgeons on Stryker's customer lists. D1 ¶ 67. The allegations further include that, on information and belief, Alphatec has a "target list of customers who Alphatec seeks to poach from Stryker using the knowledge [of Stryker's] former sales representatives[.]" D1 ¶ 69.

These allegations suffice for plausibility and require no more specificity. *See, e.g.*, *Developmental Techs., LLC v. Mitsui Chems., Inc.*, No. 8:18-CV-1582-JDW-TGW, 2019 WL 1598808, at *3 (M.D. Fla. Apr. 15, 2019) ("Plaintiff alleges that it possessed secret information in the form of 'Confidential Information' and took 'reasonable steps and efforts' to protect its secrecy. The Amended Complaint identifies several categories of confidential and proprietary information disclosed to MCA, including 'photographs of active tests and system configurations' and visual demonstrations of 'root biopsies' and the 'correlation and relationship of the plant's root structure to the Eco-Ag tubing.' The Amended Complaint further alleges that the secret information was misappropriated by MCA, who knew the information was secret. These allegations sufficiently state a claim for misappropriation of trade secrets." (internal citations omitted)).

Alphatec's argument relies on a "reasonable particularity" standard under which Howmedica would have to allege facts about the alleged trade-

secret misappropriation with reasonable particularity. *See* D15 at 9–14. The argument is unpersuasive because it disregards the federal pleading rules and standards as interpreted in *Iqbal* and *Twombly*, which require plausibility, not reasonable particularity, unless the allegations concern fraud or mistake. Moreover, even under state law, the reasonable-particularity standard applies in the discovery context, not the pleading context. *See, e.g.*, *AAR Mfg., Inc. v. Matrix Composites, Inc.*, 98 So.3d 186, 188 (Fla. 5th DCA 2012) (ruling on a discovery issue and explaining that in a trade-secret-misappropriation case, a plaintiff must identify with reasonable particularity the trade secret before proceeding with discovery); *Revello Med. Mgmt., Inc. v. Med–Data Infotech USA, Inc.*, 50 So.3d 678, 679 (Fla. 2d DCA 2010) (same). Recognizing that distinction, the Eleventh Circuit, applying *Twombly*, explained that "to satisfy this requirement at the dismissal stage in federal court, the plaintiff need only allege sufficient facts to plausibly show a trade secret was involved and to give the defendant notice of the material it claims constituted a trade secret." *DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 Fed. App'x 844, 848 (11th Cir. 2016).

While contending the reasonable-particularity standard is a pleading standard, Alphatec asserts, "Importantly, this means a plaintiff must do more than merely 'identify broad categories of information, such as financial and technical data.'" D15 at 10 (quoting *DynCorp Int'l*, 664 Fed. App'x at 848–49). No such bright-line rule exists. Applying the plausibility standard is a context-specific task. *See Iqbal*, 556 U.S. at 679. Alphatec relies only on dictum within a context-specific analysis in an unpublished, non-binding case. *See* D15 at 10 (relying on *DynCorp Int'l*, 664 Fed. App'x at 848–49).

Alphatec cites for support *American Registry, LLC v. Hanaw*, No. 2:13-CV-352-FTM-JES-UAM, 2013 WL 6332971, at *3 (M.D. Fla. Dec. 5, 2013),

*Knights Armament Co. v. Optical Systems Technology, Inc.*, 254 F.R.D. 463, 467 (M.D. Fla. 2008), and *Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1286–87 (S.D. Fla. 2007). Doc. 15 at 10–12. *American Registry* is unpersuasive because the court treated the reasonable-particularity standard as a pleading standard.* *Knights* and *Levenger* are unpersuasive because they pre-date *Iqbal*, and the courts failed to cite or rely on *Twombly*. *Knights* is also unpersuasive because it concerns a motion to compel discovery.

Alphatec argues that Howmedica's reliance on the definition of "Confidential Information" from the distributor agreements is "problematic" because Alphatec is not a party to the agreements and Howmedica is not suing any party to the agreements. D15 at 12–13. According to Alphatec, it "had no relationship or privity" to the agreements and thus "had no role in negotiating, drafting, or otherwise agreeing to the definition of 'Confidential Information.'" D15 at 13. This argument is unpersuasive. A plaintiff need not obtain a defendant's agreement on a definition to state a plausible claim for trade-secret misappropriation.

---

\* *American Registry* and other cases rely on *Treco International S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1286 (S.D. Fla. 2010), which treated the reasonable-particularity standard as a pleading standard. *See, e.g.*, *Living Color Enters., Inc. v. New Era Aquaculture, Ltd.*, No. 14-62216-CIV, 2015 WL 1526177, at *9 (S.D. Fla. Apr. 3, 2015); *Am. Registry, LLC v. Hanaw*, No. 2:13-CV-352-FTM-29CM, 2014 WL 12606501, at *3 (M.D. Fla. July 16, 2014).

*Treco* cited neither *Iqbal* nor *Twombly* and for the reasonable-particularity standard relied on *Levenger Co. v. Feldman*, 516 F.Supp.2d 1272, 1287 (S.D. Fla. 2007). *Levenger* applied the reasonable-particularity standard not at the motion-to-dismiss stage but at the post-bench-trial stage, citing *Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1322, 1324 (S.D. Fla. 2001). In *Del Monte*, the court, in granting a motion to compel discovery, held that during discovery the plaintiff had to identify with reasonable particularity the nature of the trade secrets involved. 148 F. Supp. 2d at 1324.

Alphatec contends Howmedica's "generic use" of "customers" and "customer" information is "dubious" because the customers are surgeons not bound by a confidentiality agreement with Howmedica. D15 at 13. "Simply put," Alphatec argues, "the 'customer' information [Howmedica] largely founds its [trade-secret claims] upon is free to be disclosed by the customers themselves." D15 at 13. Despite that whether an item is a trade secret is normally resolved by the factfinder, *see Lear Sigler*, 569 F.2d at 288–89, Alphatec argues at this pleading stage for judgment as a matter of law on whether Howmedica's customer information is a trade secret. The argument fails, at least at this stage. Howmedica's allegations suffice for plausibility, which is all that is required right now. *See, e.g.*, D1 ¶¶ 29–32, 36–42, 45, 46–48, 105, 115 (allegations about efforts Howmedica has taken to create and keep secret customer lists, customer "purchasing patterns," customer "preferences," customer "operating room protocol," "solicitation strategies," product "pricing formulae," product "manufacturing processes," and analyses of competitive products); *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1293–94 (S.D. Fla. 2018) (finding sufficient for plausibility the plaintiff's allegations it had "compiled its customer lists through 'considerable effort, knowledge, time, and expense to identify covered entities interested in participating in the 340B program, and in understanding and identifying their capabilities and needs'").

Alphatec complains that Howmedica makes several allegations "on information and belief." D15 at 2, 7, 11, 14. Although when deciding a motion to dismiss a court need not accept as true an allegation made "on information and belief" if the factual allegations are insufficient to make the statement plausible, *see Mann*, 713 F.3d at 1315, Howmedica includes sufficient allegations to give context to and make plausible the allegations made "on information and belief."

Denying Alphatec's motion to dismiss or state the claims more definitely, D15, is warranted.

## B.    *Does UTSA displace the tortious-interference claims?*

In moving to dismiss the tortious-interference claims, Alphatec argues UTSA "displaces any conflicting tort law claims." D15 at 3. According to Alphatec, Howmedica's tortious-interference claims arise from and "are effectively indistinguishable" from its UTSA claim. D15 at 3. Howmedica responds it alleges facts to support distinct claims. D17 at 14–19.

By statute, UTSA "displace[s] conflicting tort, restitutory, and other law of [Florida] providing civil remedies for misappropriation of a trade secret." Fla. Stat. § 688.008(1). UTSA does not displace "[o]ther civil remedies that are not based upon misappropriation of a trade secret." *Id.* § (2)(b).

To determine whether UTSA displaces a tort claim, a court considers whether material distinctions between the UTSA allegations and the tort allegations exist. *Digiport*, 314 So. 3d 553–54. Generally, UTSA displaces "other torts involving the same underlying factual allegations as a claim for trade secret misappropriation." *Taubenfeld v. Lasko*, 324 So. 3d 529, 542 (Fla. 4th DCA 2021) (internal quotation marks and quoted authority omitted).

A claim for tortious interference with a business relationship requires the existence of a business relationship, the defendant's knowledge of the relationship, the defendant's intentional and unjustified interference with the relationship, and damage to the plaintiff because of the breach of the relationship. *Bridge Fin.*, 310 So. 3d at 49.

Howmedica raises allegations for its tortious-interference claim different from allegations for its UTSA claim; specifically, Howmedica alleges that

20

Alphatec planned to "poach" Stryker's sales representatives in the Florida region and harm Stryker's customer relationships, including by inducing Stryker distributors to "without notice" terminate their agreements with Stryker and solicit customers on Alphatec's behalf. *See* D1 ¶¶ 7, 52, 55, 57, 91, 97.

Denying Alphatec's motion to dismiss the tortious interference claims is warranted.

## III.   Recommendation

The undersigned recommends **denying** the motion to dismiss or for a more definite statement, D15, and **directing** Alphatec to answer the complaint, D1, within 21 days of the order.

A party may "serve and file specific written objections" to the proposed recommendation by **July 1, 2022**. *See* Fed. R. Civ. P. 72(b)(2). A party may respond to any objection within 14 days of service of the objection. Failure to specifically object to the proposed recommendation alters review and results in a waiver of the right to challenge anything to which no specific objection was made. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b)(3); 11th Cir. R. 3-1.

**Entered** in Jacksonville, Florida, on June 17, 2022.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*